--------o--------

## Siceloff and Another *v.* Redman's Administrator.

Rule in Shelley's Case.—As the common law has been adopted by statute in this State, the rule in *Shelley's* case is binding upon the courts as a law of real property. Page 259.

Same.—Devises.—A devise to one "for his use and benefit during his life, and then to his heirs and assigns," is within the rule in *Shelley's* case. Page 261.

SAME.—EXECUTORY TRUST.—But where there is an executory trust, with a discretionary power vested in the trustee, the rule does not apply. Page 262.

SAME.—PERSONAL PROPERTY.—The rule applies to real estate only, not to personal property. Page 262.

APPEAL from the *Floyd* Common Pleas.

ELLIOTT, J.— *Virginia Siceloff* and *Maria F. Baird,* the appellants, filed a complaint in the Common Pleas Court of *Floyd* county against *John H. Stotsenburg,* administrator *de bonis non* of the estate of *Isaac Redman,* deceased, alleging that they are the daughters of *Isaac Redman,* who departed this life on the 4th day of *July,* 1856, and are the same *Virginia Siceloff* and *Maria F. Baird* referred to and named in item four of the last will and testament of said *Isaac Redman;* that there was then in the hands of said administrator, and under his control, derived from the sale of the real estate in *Louisville, Kentucky,* referred to in item six of the last will of said *Isaac Redman,* about the sum of $40,000, to be invested in real estate, and for distribution under the terms of said will; that the plaintiffs had demanded of the administrator that their shares of said fund under the will, so far as it was to remain in personalty, should be paid to them in money, for their own exclusive use and benefit, and that the real estate in which their portions of said fund were invested should be conveyed to them respectively in fee simple; but that said administrator refused so to do, claiming that, under said will, the plaintiffs were only entitled to a life estate in the real estate, and to a life interest in the personalty, and that he would so convey the real estate and invest the personalty. The complaint prays that the plaintiffs' interest in said fund, so far as it was to remain in personalty under the will, should be paid to them as their absolute property, and that the real estate, in which a portion of the fund was to be invested under the will, should be conveyed to them in fee simple, and for general relief. The will had been duly admitted to probate, and a copy of it was made part of the complaint. The fourth clause, or item, contains the devise or bequest to the plaintiffs, but

as other portions of the will are deemed to have a material bearing on the question involved in the case, we give it entire:

"In the name of the Benevolent Father of all, I, *Isaac Redman,* of the county of *Floyd,* and State of *Indiana,* do make and publish this, my last will and testament.

"*Item* 1. I devise and bequeath to my beloved wife so much of my estate as the present law defines for the widow's dower; also, all my household and kitchen furniture, with such other of my personal property as she may desire.

"*Item* 2. I devise and bequeath to my son, *William J. Redman,* $4,000; $3,000 of which shall be in real estate, the rents and use of which shall be for his benefit during his life, and for his wife, should she outlive him, so long as she remains a widow, then to belong to said *William's* heirs and their assigns.

"*Item* 3. I devise and bequeath to my grandson, *Henry C. Redman,* $1,500, $1,000 of which shall be in real estate, for his use and benefit during his lifetime, then to his heirs and assigns.

"*Item* 4. After the payment of my funeral expenses, my just debts, the expenses of settling my estate and adjusting the gifts and dower named in items one, two and three, I devise and bequeath the entire remaining amount of my property, in equal proportions, to my son, *Robert L. Redman,* and my daughters, *Maria Baird* and *Virginia Siceloff.* The amount to *Robert* shall be to him, his heirs and assigns. The amount to *Maria* shall be for her use and benefit during her lifetime, then to her heirs and assigns. The amount to *Virginia* shall be for her use and benefit during her lifetime, then to her heirs and their assigns. At least two-thirds of *Maria's* and *Virginia's* portions shall be in real estate.

"*Item* 5. I do hereby nominate and appoint my beloved wife, *Isabella Redman,* and my son, *Robert L. Redman,* executors of this my last will and testament, hereby

authorizing and empowering them to compromise, adjust, release and discharge, in such manner as they may deem proper and best, the debts and claims due me, and, if they shall think it best, in order to comply with this my last will, to sell or exchange all or any part of my real estate, to execute, acknowledge and deliver deeds in fee simple for the same, and to purchase real estate in such places and for such price as they think best and proper to comply and fill the bequests of this my last will and testament.

"*Item* 6. The real estate belonging to me in *Louisville, Kentucky,* shall not be sold, exchanged or divided without the consent and approval of my said executors, but the rents and profits of it may be divided between my heirs, according to justice, taking this my will for the criterion for division.

"*Item* 7. My heirs shall not have power to force or compel my executors to sell or divide my real estate, that I now own or may hereafter purchase, for the period of ten years from this date.

"I do hereby revoke all former wills by me made.

"In witness whereof I have hereunto set my hand and seal, this 29th day of *December,* A. D. 1855.

(Signed)    "Isaac ⋈ Redman," [SEAL.]

It was duly attested by two witnesses.

The court sustained a demurrer to the complaint, because it did not state facts sufficient to constitute a cause of action, and rendered final judgment against the plaintiffs for costs, to which they excepted.

The question presented in the case for our consideration and decision is, whether, under the provisions of *Redman's* will, his daughters, *Maria* and *Virginia,* are entitled to an absolute property in that portion of the fund in the hands of the administrator, not to be invested in real estate, in which they have an interest, and to a fee simple in the real estate to be purchased with the residue, or only to an estate for life? The appellants insist that, under the rule in

*Shelley's* case, they are entitled to an absolute property in the personalty, and to a fee simple in the real estate to be purchased by the administrator under the provisions of the will.

*Shelley's* case was decided in the twenty-third year of the reign of *Elizabeth,* and is reported in 1 Coke's R. 94. The rule declared in the case is stated to be, "that when the ancestor, by any gift or conveyance, taketh an estate of freehold, and in the same gift or conveyance an estate is limited, either mediately or immediately to his heirs, in fee or in tail, 'his heirs' are words of limitation of the estate, and not words of purchase." The word heirs, or heirs of the body, create a remainder in fee or in tail, and the theory of the rule is, that the law, to prevent an abeyance, vests the remainder in the ancestor, who is the tenant for life, and by a conjunction of the two estates, the estate for life is swallowed up or merged in the remainder, which is executed on the estate for life; and the tenant for life thereby becomes tenant in fee or in tail.

Mr. *Washburn,* in his excellent work on real property, speaking in reference to this rule, correctly remarks that its peculiarity is, "that while in form the estate has two parts, a particular one for life, with a contingent remainder to the heirs of the tenant who takes the particular estate, it is, constructively, a single estate of inheritance in the first taker. The form of limitation of such estates is to the grantee or devisee for life, and after his death to his heirs or the heirs of his body, either mediately or immediately, both estates being created by the same deed or devise. This rule, instead of regarding a part of the entire estate as in the ancestor, and a part in his heirs, considers the entire estate as being in him alone; that the intent in creating it was to have it go in a certain line of succession, and if the first taker died intestate, his heirs should take by descent from him and not as purchasers under the original limitation." 2 Wash. on Real Prop., p. 268.

Various reasons have been suggested for the rule in its origin. Mr. *Petersdorff* in his abridgment states them

to be, that "If the construction had been made according to the strict meaning of the words, A would have taken only an estate for life, and the remainder to the heirs, &c., of A would have been considered as words of purchase, giving a contingent remainder to the heirs, &c., of A, according to the rule of law that *nemo est hæres viventis;* but such a construction would have been attended with these inconveniences: 1. The lord of the fee would have been deprived of the wardship and marriage of the heir; because, in that case, the heir would have taken as a purchaser, without claiming anything from his ancestor by descent. 2. The remainder to the heir or heirs of the body being contingent until the death of the tenant for life, the inheritance would have been in suspension or abeyance, which was never allowed but in cases of absolute necessity; because the abeyance of the inheritance created a suspension of various operations of law, particularly of the remedies for the recovery of land by real actions.   3. If the remainder in those cases had been construed to be contingent, no alienation could have taken place in the lifetime of the ancestor." Vol. 14, p. 222.   See, also, 4 Kent 216.

But, whatever reasons may have induced the rule in its origin, it has ever been regarded by many of the ablest jurists, even in *England,* where it originated, with disapprobation, as productive of injustice, and especially in its application to devises, by casting the estate in fee upon the tenant for life, and thereby defeating the remainder to the heirs, in violation of the clearly expressed intention of the testator.   And though the rule was adhered to by the courts of that country until abrogated or modified by the statute of 3 and 4 Wm. 4, ch. 106, (see note to 4 Kent, 3 ed. 229) it has been the source of much discussion, legal refinement and learning.

The rule is applied to devises of real estate, but as it is the fundamental maxim in the construction of devises, that the intention of the testator, when apparent, must govern, if not inconsistent with some established rule of law, it is

held that the word 'heirs,' or words 'heirs of the body,' may be construed to have been used as a mere description of the persons to whom the remainder is devised, and thereby become words of purchase, and not of limitation, where the testator's intent so to use them is so fully expressed in the will as to leave no doubt in any reasonable mind of that intent. But even this rule, thus strongly stated against the remainder-man, is again frittered away by a refined subdivision into a particular intent, as applied to the tenant for life, and a general intent as to the estate in remainder.

The question arose upon a devise of real estate, in the famous case of *Perrin* v. *Blake*, decided in the King's Bench in 1770, and removed by writ of error to the Exchequer Chamber, where it was decided in 1772. In the former court it was held by three judges against one, that the rule in *Shelley's* case did not apply; but the judgment was reversed in the Exchequer Chamber, seven judges against one holding that the rule did apply and that *John Williams*, the first taker, took an estate tail.

*Sir William Blackstone*, in his opinion in the Exchequer Chamber, in favor of the application of the rule in that case, admitted "that the great and fundamental maxim upon which the construction of every devise must depend, is that the intention of the testator shall be fully and punctually observed, so far as the same is consistent with the established rules of law." He further said that "the rule in *Shelley's* case is not to be reckoned among the great fundamental principles of judicial policy, which cannot be exceeded or transgressed by any intention of the testator; for if the intention of the testator be clearly and manifestly contrary to the legal import of the words which he has thus hastily and unadvisedly made use of, the technical rule of law shall give way to this plain intention of the testator.

"The rule of law laid down in *Shelley's* case is, that where the ancestor takes an estate of freehold, with remainder to his heirs, or heirs of his body, the word

'heirs' is a word of limitation of the estate, and not of purchase; that is, in other words, that such remainder vests in the ancestor himself; and the heir when he takes, shall take by descent from him, and not as a purchaser. It was first established to prevent the inheritance from being in abeyance, and to facilitate the alienation of land.

"This rule, when applied to devises, may give way to the plain and manifest intent of the devisor; provided that intent be consistent with the great and immediate principles of legal policy; and provided it be so fully expressed in the testator's will, or else may be collected from thence by such cogent and demonstrative arguments, as to leave no doubt in any reasonable mind whether it was his intent or no."

And again, referring to the devise in that case, he said: "The question is not whether the testator intended that his son *John* should have a power of alienation; for he most clearly expressed that the son should not have such a power. The question is not, whether the testator intended that his son should have only an estate for life; for he believed there never was an instance, when an estate for life was expressly devised to the first taker, that the devisor intended he should have any more. But if he afterwards gives an estate to the heirs of the tenant for life, or to the heirs of his body, it is the consequence or operation of the law that in this case supervenes his intention, and vests a remainder in the ancestor. * * * * That the ancestor was intended to take an estate for life was certain; that his heirs were intended to take after him was equally certain; but how those heirs were intended to take, whether as descendants or as purchasers, was the question? If the testator intended they should take as purchasers, then *John,* the ancestor, only remained tenant for life; if he meant they should take by descent, or had formed no intention about the matter, then, by operation and consequence of law, the inheritance first vested in the ancestor."

Now with great deference to an argument emanating from so distinguished a source, we venture to ask, if it be true, as

stated, that in such a case the clearly expressed intention of the testator is to govern, and therefore the object of the inquiry is to discover that intention, and if it be true as admitted that the ancestor was intended to take a life estate and no more, and if the testator intended that the heirs should take after him, how could it be inferred that he intended they should take by descent from the ancestor, to whom he had not, at least as he supposed, given an estate that could descend? On the contrary is it not clearly apparent that as he did not intend to devise more than a life estate to *John*, which would terminate at his death, and could not therefore descend to his heirs, he must have intended that the heirs should take directly from him as purchasers, or as the root of a new stock, and not by descent from the ancestor?

*Lord Mansfield*, in his opinion in the same case, in the King's Bench, in opposition to the application of the rule, said "he always thought that as the law had allowed a free communication of intention to a testator, it would be strange law to say, 'now you have communicated that intention, so as every body understands what you mean, yet because you have used a certain expression of art, we will cross your intention and give your will a different construction; though what you meant to have done is perfectly legal, and the only reason for contravening you is because you have not expressed yourself like a lawyer.' That his examination of the question always convinced him that the legal intention, when clearly explained, was to control the legal sense of a term of art, unwarily used by the testator." The case was first reported in 4 Burr. 2579, but is more fully given in 3 Greenleaf's Cruise on Real Property, side p. 313, *et seq.*

The rule in *Shelley's* case is a rule of the common law, and as the common law has been adopted in this State by statute, the rule is binding upon the courts as a law of real property in *Indiana.*

It may be remarked that whatever reasons may have once existed for it in *England* have, even there, long since

ceased, and no good reason is perceived for its incorporation into the legal policy of this country. It was doubtless introduced into many of the other states as into this, as a part of the common law, without discussion or question as to its propriety, but it has been abrogated in many of them by statute, especially in its application to devises. See 2 Wash. on Real Prop. 276, and note. Its propriety as a rule of law, in this State, is seriously doubted, and it may be regretted that the attention of the legislature has not been directed to the propriety of its repeal, as its only effect, and more particularly in its application to devises, is to defeat the real intention of testators.

In *Sorden* v. *Gatewood*, 1 Ind. 107, the question arose upon a deed to real estate "to *Sarah Gatewood*, during her natural life, and to her children and their assigns forever." It was held that the rule in *Shelley's* case did not apply, the words "her children" being words of purchase and not of limitation.

In *Doe* v. *Jackman*, 5 Ind. 283, a devise of lands was made "to *Gerardus Meddack* and *Margaret Patterson* for and during the term of their natural lives, and after their decease to their children, the heirs of their bodies, forever." It was held that the words "their children," being words of purchase and not of limitation, should control; the superadded words, "heirs of their bodies," being regarded but as a description of the same persons, their children, and the rule therefore did not apply. In the opinion of the court, by DAVISON, J., it was said that the rule in *Shelley's* case "is no doubt a law of real property in *Indiana*. Still it will not, in any case, be allowed to override the manifest intent of the testator, provided such intention be not unlawful or inconsistent with the rules of law. The rule is not designed to give meaning to words, but to fix the nature and quantity of an estate. Whenever, then, the matter becomes certain that the term heirs is used with an intent that they should take as purchasers, the instrument should be so construed. Indeed, there is no rule that can guide us safely through

the numerous cases and apparent conflict of authorities on this subject, save that which looks to the intent of the testator.

"Upon the first clause of the devise there can be no controversy. 'I give all my lands,' &c., 'to my son *Gerardus,* and my daughter *Margaret,* for and during the term of their natural lives.' This language admits of but one interpretation. The purpose of the testator to create an estate for life could not be more directly or strongly expressed. But the language thus used, explicit as it may be, will not prevent the application of the rule, unless the words 'after their decease I give the same to their children, the heirs of their bodies, forever,' indicate that he intended to dispose of an estate in remainder, after the previous life estate was spent. If full effect can be given to the terms, 'their children,' the case is clearly with the plaintiff, because, 'where a conveyance was to A, for and during his natural life, and to his children forever,' this court held that the rule in *Shelley's* case did not apply; that the words 'his children,' are words of purchase and not of limitation. *Sorden* v. *Gatewood,* 1 Ind. 107. But the term 'heirs,' is one of limitation. It has a fixed and legal meaning, and a mere presumed intention will not control its signification. It cannot be held a word of purchase, unless the testator's intent so to use it appears manifest."

This opinion is in accordance with the current of the leading cases on the subject.

Applying the rules of construction thus stated to the clause of the will under consideration, it must be admitted that they bring it clearly within the rule in *Shelley's* case. "The amount to *Virginia* shall be for her use and benefit during her lifetime, then to her heirs and their assigns." Although from this language it is apparent that the testator intended that *Virginia* should take a life estate only, and that her heirs should take after her death, and as the estate so intended to be granted to *Virginia* would ter-

minate at her death, and could not, therefore, descend to her heirs, it would seem apparent that the testator intended that the heirs should take directly from him, as purchasers, and not by descent from the ancestor; yet, by the technical meaning applied to the word heirs, under the rule in *Shelley's* case, this apparent intention is denominated a presumed intent, and is not allowed to control the technical meaning of the word heirs, or in other words, despite the apparent intent of the testator, the rule gives the fee to the ancestor.

But we think the facts as they appear in this case present a valid reason why the rule should not apply. Specific real estate is not devised by the fourth clause of the will. True, it appears from the will that at the date of its execution, the testator was seized of real estate, but over this a very full discretionary power is given by the fifth and sixth clauses to the executors, to divide or exchange it for other real estate, or to sell it and purchase other lands to comply with and fill the bequests of the will. .

The fund now sought to be controlled arises, as is alleged, from a sale of the real estate in *Louisville*, over which the administrator may exercise a discretionary power and control, as the successor of the executors in the trust. Here, it seems to us, is clearly an executory trust, with a discretionary power vested in the trustee, and it has been held that in such cases the rule in *Shelley's* case does not apply. 4 Kent's Com., pp. 218, 219, 220, and note *a*. See also, 6 Greenleaf's Cruise on Real Prop., § 63, *et seq.*, side pp. 306, 307. In *Papillon* v. *Voice*, 2 P. Wm. 471, cited in note *a* to 4 Kent's Com., 220, the devise was of lands to B for life, with remainder to trustees to support contingent remainders, remainder to the heirs of the body of B, and the limitation was held to be an estate tail in B; but so far as the will directed lands to be purchased and settled in the same way, it was an executory estate or trust, and the intention was to govern, and not the rule of law. The rule applies to grants or devises of real estate only, and not to personal property.

, In the case at bar, it being a trust, the court below might have retained the case and directed the investment of the fund according to the intention of the testator, but as the complaint avers that the administrator intended so to invest it, the plaintiffs cannot complain of the action of the court in dismissing the complaint. They were not entitled to the relief prayed.

GREGORY, C. J.—I concur in the result arrived at, but do not approve of the criticism on the rule in *Shelley's* case, as applied to devises, as held in *Perrin* v. *Blake*. Nor do I join in the suggestion that the rule in *Shelley's* case ought to be modified by legislation.

The judgment is affirmed with costs.

*T. M. Brown* and *D. W. Lafollette*, for appellants.

*J. H. Stotsenburg*, for appellee