JUNE.

## LYLES *vs.* DIGGES's Lessee.

D, by his will, devised as follows:—
*Item.* I give and bequeath all that my land or messuage, with the appurtenances whereon I now dwell, called W, also all that tract of land called F, adjoining thereto, to my loving son W, to hold to him, during his natural life, and from and after his decease, I give all the said messuage, lands and tenements, to my dear grandson C, eldest son of the said W, and from and after the decease of my said grandson C, then to remain to the first son of my said

APPEAL from *Prince-George's* county court, from a *pro forma* judgment rendered in favour of the plaintiff, from which the defendant appealed to this court. It was an action of ejectment for a tract of land called *Frankland.* A statement of facts was agreed to, in which many things were stated which are unnecessary to be mentioned here, as the question turned wholly on the devises in the will of *Charles Digges,* dated the 28th of January 1741. The devises are as follows, viz. "Item. I give and bequeath all that my land or messuage, with the appurtenances whereon I now dwell, called *Warburton Manor,* as also all that tract of land called *Frankland,* adjoining thereto, to my loving son *William Digges,* to hold to him during his na-

grandson, and the heirs of the body of such first son lawfully issuing; and for default of such issue, then to the use and behoof of the second, third, fourth and fifth, and all and every other sons of my said grandson C, to be lawfully begotten, the elder of such son or sons, and the heirs of his body lawfully issuing, always to be preferred, and to take before the younger of such sons, and the heirs of his body, and for default of such issue, then I give the same to my grandson T, second son of the said W, for and during the term of his natural life, and after his decease, to remain to his issue in tail, in such manner as I have limited the same to my grandson C, and his issue; and for default of such issue, then to remain to my grandson G, third son of the said W, for and during the term of his natural life, and after his decease, to be and remain to his issue in tail, in the same manner as before limited for the issue of my grandson C; and for default of such issue, then to remain to my own right heirs forever."—*Held,* that T took only an estate for life in the premises devised to him.

The rule in *Shelley's* case is equally applicable to limitations in wills as in deeds.

The word *issue* in a will is sometimes a word of limitation, and sometimes of purchase, according to the context of the devise.

1825.

Lyles
vs
Digges

tural life, and from and after his decease, I give all the said messuage, lands and tenements, to my dear grandson *Charles Digges*, eldest son of the said *William Digges*, and from and after the decease of my said grandson *Charles*, then to remain to the first son of my grandson, and the heirs of the body of such first son lawfully issuing; and for default of such issue, then to the use and behoof of the second, third, fourth and fifth, and all and every other sons of my said grandson *Charles*, to be lawfully begotten, the elder of such son or sons, and the heirs of his body lawfully issuing, always to be preferred, and to take before the younger of such sons, and the heirs of his body; and for default of such issue, then I give the same to my grandson *Thomas*, second son of the said *William Digges*, for and during the term of his natural life, and after his decease to remain to his issue, in tail, in such manner as I have limited the same to my grandson *Charles*, and his issue; and for default of such issue, then to remain to my grandson *George*, third son of the said *William Digges*, for and during the term of his natural life, and after his decease to be and remain to his issue, in tail, in the same manner as before limited, for the issue of my grandson *Charles*; and for default of such issue, then to remain to my own right heirs for ever." The testator died about the month of May 1744, and after his death his eldest son *William Digges*, entered upon and was seized of the land in the declaration mentioned, claiming and holding the same under the aforegoing clause in the will of his father. He continued seized, holding and claiming the same under the said will, and without making any disposition thereof till his death, which happened about the year 1783. After the death of *William Digges*, his son *Charles*, mentioned in the will aforesaid, having died in the year 1769, *Thomas A. Digges*, in the said will named, and second grandson of the testator, entered upon the said lands, claiming and holding the same under the said will; and being seized thereof, he the said *Thomas A. Digges*, on the 25th of May 1803, by his deed of bargain and sale, conveyed the land in question to *Thomas Harris*, who on the same day reconveyed to the said *Thomas A. Digges*, by deeds duly executed, acknowledged and recorded. *Thomas A. Digges* afterwards, on the 9th of July 1806, duly executed and acknowledged a deed to *William Lyles*,

which was duly recorded, conveying to him part of the tract of land called *Franklin*, for which this action was brought. It was admitted that the defendant acquired the legal title to whatever estate in said land was conveyed to the grantee in the said last deed, by the will of *William Lyles*, dated the 26th of August 1800. The defendant, and those under whom he claims, have been in the seizin and possession of this land ever since the execution of the said deed. *Thomas A. Digges* died in December 1821, without having had any issue. *George Digges*, third son of the testator's son *William*, and who is named in the clause of the said will herein before set forth, died before the said *Thomas A. Digges*, leaving issue the lessor of the plaintiff, his only son and heir male, who claims the premises in the declaration mentioned, under the devise aforesaid in the will of the before named *Charles Digges*. Lease, entry and ouster, were admitted.

The cause was argued in this court before BUCHANAN, Ch. J. EARLE, MARTIN, STEPHEN, and ARCHER, J.

*Magruder* and *F. S. Key*, for the Appellant, contended, that under the will of *Charles Digges*, his grandson *Thomas* took an estate tail, which was destroyed by his deed to *Harris*. They cited and relied on the rule in *Shelley's* case, 1 *Coke* 93, 104. 1 *Fearne on Cont. Rem.* 170, 191 to 196, 198 to 201. *Thomas's Coke Litt.* 150, 378. 2 *Blk. Com.* 173. *Preston on Estates,* 271 to 275, 283, 381, 383, 359, 362, 263. *Coll. Jurid.* 221. 4 *Cruise's Dig.* 299. *Backhouse vs. Wells,* 1 *Eq. Ca. Ab.* 184, pl. 27. *Dodson vs. Grew,* 2 *Wils.* 322. *Robinson vs. Robinson,* 1 *Burr.* 38. *Legat vs. Sewell,* 1 *Eq. Ca. Ab.* 395. *Jones vs. Morgan,* 1 *Brown's Chan. Rep.* 206. *Langley vs. Baldwin,* 1 *Eq. Ca. Ab.* 185. *Attorney General vs. Sutton,* 1 *P. Wms.* 57. *Archer's case,* 1 *Coke,* 66. *Lowe vs. Davies,* 2 *Ld. Raym.* 1561. *Hopkins vs. Hopkins,* 1 *Vez.* 268, S. C. 1 *Atk.* 581. *Goodlittle, dem. Sweet vs. Herring,* 1 *East,* 264. *Lisle vs. Grey,* Sir *T. Raym.* 278, 302. 315. *Doe vs. Applin,* 4 *T. R.* 82. *Goodright vs. Pullyn,* 2 *Ld. Raym.* 1438. *Doe vs. Cooper,* 1 *East,* 229. *Pratt's Lessee vs. Flamer,* 5 *Harr. & Johns.* 10. *Sayer vs. Masterman, Ambl.* 344. *Poole vs. Poole,* 3 *Bos. & Pull.* 620. *Denn vs. Puckey,* 5 *T. R.* 299, 305. *Cory-*

*ton vs. Helyar,* 2 *Cox,* 340; and *Wykham vs. Wykham,* 18 *Ves.* 420.

*Jones, Taney* and *Marshall,* for the Appellee, referred also to the cases cited by the appellant's counsel, and to 2 *Inst.* 110, 112. 2 *Blk. Com.* 116, 117. *Fearne* 148, 154, 155, 152, 153, 194, 192, 150, 149, 196, 197, 90. *Preston,* 295, 266, 379, 380, 381. *Harg. L. T.* 506. *Doe vs. Laming,* 2 *Burr.* 1100. *Doe vs. Collis,* 4 *T. R.* 294. *Lodington vs. Kime,* 1 *Salk.* 224. *Doe vs. Perryn,* 3 *T. R.* 484. *Doe vs. Mulgrave,* 5 *T. R.* 320. *Bamfield vs. Popham,* 1 *P. Wms.* 54. *Foster vs. Romney,* 11 *East,* 603, (note.) *Hay vs. Coventry,* 3 *T. R.* 86; and 4 *Cruise,* 298 to 300.

BUCHANAN, Ch. J. delivered the opinion of the court. This case depends upon the construction of the will of *Charles Digges,* dated the 28th of January 1742, which *inter alia* has the following devise: "*Item,* I give and bequeath all that my land or messuage, with the appurtenances whereon I now dwell, called *Warburton Manor,* as also all that tract of land called *Frankland,* adjoining thereto, to my loving son *William Digges,* to hold to him during his natural life; and from and after his decease, I give all the said messuage, lands and tenements, to my dear grandson *Charles Digges,* eldest son of the said *William Digges,* and from and after the decease of my said grandson *Charles,* then to remain to the first son of my said grandson, and the heirs of the body of such first son lawfully issuing; and for default of such issue, then to the use and behoof of the second, third, fourth and fifth, and all and every other sons of my said grandson *Charles,* to be lawfully begotten, the elder of such son or sons, and the heirs of his body lawfully issuing, always to be preferred, and to take before the younger of such sons, and the heirs of his body, and for default of such issue, then I give the same to my grandson *Thomas,* second son of the said *William Digges,* for and during the term of his natural life, and after his decease, to remain to his issue in tail, in such manner as I have limited the same to my grandson *Charles,* and his issue; and for default of such issue, then to remain to my grandson *George,* third son of the said *William Digges,* for and during the term of his natural life, and after his decease, to be and remain to his issue in tail, in the same manner as before limited, for the

use of my grandson *Charles;* and for default of such issue, then to remain to my own right heirs for ever." And the question is, whether *Thomas Digges* took an estate for life only, or an estate tail? In the exposition of wills, it is a general rule, that the intention of a testator expressed in his will, shall prevail, if consistent with the settled rules of law.

For the appellant it is contended, that the devise to *Thomas Digges,* &c. is within the rule laid down in *Shelley's* case, "that where the ancestor takes an estate of freehold by any gift or conveyance, and in the same gift or conveyance an estate is limited either mediately or immediately to his heirs, in fee, or in tail, the word heirs is a word of limitation of the estate, and not a word of purchase," which as a known and established rule of law controls and governs it, and that he took an estate tail.

The first inquiry to be made is, how the devise to *Thomas Digges* should be construed in relation to the previous devise to *Charles Digges?* that is, whether it is to be taken as an entirely unconnected disposition, to be construed alone, without reference to any other, the words to "remain to his issue in tail," denoting not only the estate intended to be passed, but the manner also in which it should pass; and the subsequent words "in such manner as I have limited the same to my grandson *Charles* and his issue," as explanatory only of the previous limitations to *Charles* and his heirs. And it seems to be perfectly clear, that the latter words were introduced by way of reference to the limitation to *Charles Digges,* and his sons; for the meaning of the testator, in the use of the words, "to remain to his issue in tail," after the limitation to *Thomas Digges* for life; and construed, as it should be, with that reference, the whole clause must be understood, as if in place of the words "his issue in tail," the words of the preceding limitations to *Charles Digges,* and his first and other sons, &c. were particularly repeated, which is at variance with no known principle of construction. On the contrary, it is a rule in the interpretation of wills, that the whole of the instrument shall be taken and examined together, in order to arrive at the intention of the testator, which shall prevail if there be apt words to effectuate it; and it is settled that even the technical word "heirs" may by reference to a preceding distinct limitation, be qualified

1825.

Lyles
vs
Digges

and restrained to mean "sons." The words "in such man-
ner as I have limited the same to my grandson *Charles*,
and his issue," are manifestly words of relation, and mean
"to the first son of *Thomas*," &c. and so on, as in the
words of the limitations, to the first and other sons of
*Charles*, the word "issue" there used being, by reference,
synonymous to sons; and whatever estate *Charles Digges*
took, whether in tail, or for life only, the same estate was
given to *Thomas*. What estate then did *Charles Digges*
take under the will of his grandfather? Admitting the rule
in *Shelley's* case, though in terms applied to conveyances
by deed, to be equally applicable to limitations in wills, as
it certainly is, it remains to be seen whether this case is
within that rule.

To bring it within the rule, the word "issue," "for de-
fault of such issue," is resorted to to explain the sense in
which the word "son" is used, as a word of more extensive
signification, and is relied upon as being synonymous to the
word heirs. That word, in the place where it is first found,
immediately following the limitation to the first son of
*Charles Digges*, and the heirs of his body, is used in rela-
tion to the heirs of the body of that son, and by force of
the relative word such, is to be understood to mean "heirs;"
that is, the heirs of the body of the first son of *Charles*,
which surely can have no effect upon the sense in which
the words "first son" are used. Or if it should be con-
strued to relate to the first son of *Charles*, as well as to the
heirs of the body of such first son, still it would be re-
strained by the same relative term "such," to mean "son."
And the same word afterwards used, and explained by the
accompanying word "such," relates to, and is restrained
to mean the first and other sons of *Charles Digges*, and
the heirs of the bodies of such sons respectively; but if it
were not so, it by no means follows that the word "issue"
would have the effect to bring this case within the rule in
*Shelley's* case, being sometimes a word of limitation, and
sometimes of purchase, in a will, according to the context,
and to borrow the language of Mr. *Fearne*, "of less tech-
nical force" than the word "heirs" in the plural number,
and is not *ex vi termini* within the rule.

It is not, however, our purpose to inquire minutely to
what cases the rule is, or is not applicable, that would lead
to an almost endless examination; but briefly whether this

particular case is within it. And in order to arrive at a correct conclusion, it would seem to be only necessary to look to the leading principle of the rule; which is, that the limitation must not be to an individual or individuals of the family of the person to whom the life estate is given, as a son, sons or children, but must be to his heirs, general or special, and so extend to and comprise the whole line of described heirs, *as a class or denomination of persons to take in succession,* as that the person who takes after the tenant for life, whoever he may be, must be one who indiscriminately answers the relative description of heir general or special, (as the case may be,) of the ancestor referred to, and takes *eo nomine,* or technically in that character only; and that, there must be nothing in the limitation to restrain the operation of it *to the person so first taking, or his representatives as such,* but that it must reach to, and equally comprehend *all other persons successively answering the same relative description,* and entitle them to take under it *eo nomine* and by virtue only of such relation to the ancestor. *Doe vs. Colyear,* 11 *East,* 564. *Preston on Estates,* ch. 3. *Fearne on Remainders,* sec. 5. As in the particular case of *Shelley,* where the limitation was "to *Edward Shelley* for the term of his life, without impeachment of waste; and after his decease to the use of Mr. *Caril* and others, for 24 years; and after the said 24 years ended, then to the use of the heirs males of the body of the said *Edward Shelley* lawfully begotten, and of the heirs males of the body of such heirs males lawfully begotten; and for default," &c.

There the limitation to the use of the heirs male of the body of *Edward Shelley* lawfully begotten, not being confined to one or more persons, in whom the character of heirs should first be fulfilled, but embracing all possible heirs of the given description, as a class of persons to take successively, and in that character only, *Edward Shelley* was held to take an estate tail, notwithstanding the superadded words of limitation "to the heirs males of the body of such heirs males lawfully begotten;" &c. they being of the same import with the preceding words of limitation, and virtually included in them; and not inconsistent with the nature of the descent pointed out by them.

But if they had provided a different order of succession from that described by the first limitation "to the use of

1825.

Lyles
vs.
Diggcs

the heirs males of the body of *Edward Shelley* lawfully begotten," and could not have been construed to mean the heirs in succession of the first named heirs, as heirs of *Edward Shelley*, then *Edward Shelley* would have taken an estate for life only. As in the case put by *Anderson* in *Shelley's* case of a limitation to the use of A for life, remainder to the use of his heirs, and of their heirs female; the superadded words of limitation, "and of their heirs female," denoting a different species of heirs from that described by the preceding words "his heirs," the one being a limitation in fee simple, and the other in tail female; the superadded words of limitation, in such a case, manifesting the intention of the testator, that the first taker should only have an estate for life, and that the words "his heirs," were only used to designate those who should form the root of a new inheritance.

Where there is a limitation to an individual or individuals of the family of the first taker, as to a son, sons or children, with superadded words of limitation to his or their heirs in fee or in tail, such selection being a manifestation of the testator's intention to constitute the person or persons selected, a stock from which the inheritance shall be deduced, there can be no doubt that the ancestor referred to, will take an estate for life only, notwithstanding the person or persons so selected may also fill the character of heir or heirs to such ancestor; as in the case of a limitation in strict settlement on first and other sons.

In *Lisle vs. Grey*, Sir *T. Raym. Rep.* 278, *Fearne on Rem.* 151, the covenantor covenanted to stand seized to the use of himself for life, and after his decease, to the use of E, his son, for life, and after his decease, to the use of the first son of the body of E, and the heirs male of the body of such first son; and for default of such issue, to the use of the second son of the body of E, and the heirs male of the body of such second son; and for default of such issue, to the use of the third son of the body of E, and the heirs male of such third son; and for default of such issue, to the use of the fourth son of the body of E, and the heirs male of the body of such fourth son; *and so* severally and respectively *to every of the heirs male* of the body of the said E, and the heirs male of the bodies of such heirs male according to their ages and seniorities; and for default of such issue, remainder, &c. and it was held, that the words "and so," &c. were words of relation, and meant in the

same manner, as the four first sons took, and that E took only an estate for life, the general import of the word heirs being qualified by the preceding particular limitations to the first and other sons. And thus construed, it stood as if it had been in terms a limitation to E for life, remainder to his first, second, and other sons, and the heirs male of the bodies of such sons respectively. In *Lowe vs. Davies*, 2 *Ld. Raym.* 1561, the devise was "to B, and his heirs lawfully to be begotten; that is to say, to his first, second and third, and every son and sons successively, lawfully to be begotten of the body of said B, and the heirs of the body of such first, second, third, and every other son and sons successively, lawfully issuing, as they should be in seniority of age and priority of birth, the eldest always, and the heirs of his body, to be preferred before the youngest, and the heirs of his body; and in default of such issue then over," &c. In that case the words "his heirs" were considered as being explained by the words "that is to say," to mean first, second, and other sons, &c. And it was decided that B took only an estate for life, that being the manifest intention of the testator. In *Sweet vs. Herring*, 11 *East*, 264, the devise was to *Margaret Davie* for life, and after her decease to the heirs male of her body to be begotten, severally, successively and in remainder. one after another, as they and every of them should be in seniority of age and priority of birth, the elder of such sons, and the heirs male of his body lawfully issuing, being always preferred, and to take before the younger of such son and sons, and the heirs male of his and their bodies; and for want and in default of such issue, then over," &c. There it was held, that the words "heirs of her body," were not used in their strict technical sense as words of limitation, but were explained and qualified by the subsequent words "the elder of such sons," by which they were plainly designated by the devisor as purchasers to take in their own right, and not by descent from their mother; and thus explained, the whole clause was viewed as if it had been a devise to her for life, and after her decease to her first and other sons successively in tail, male.

Now what is this case? Why a devise to *Charles Digges*, and after his decease to his first, second, and third sons in succession, and the heirs of their bodies respectively, in no respect differing in principle from either of the

cases cited. In each of those cases, to be sure, the word "heirs" is used, which, if unexplained by the context, would have been a word of limitation, and have operated to give to the first taker an estate tail; but here is not that word, and this case is clear even of that difficulty, and which was the only difficulty raised in either of them; the case of *Bamfield vs. Popham* 1 *R. Williams*, 54, is directly in point. But here the words "for default of such issue," are relied upon as controling the sense in which the word "son" is used, and explaining it to mean "issue." I have endeavoured to show, that they have no such operation, and it will be seen, that in *Lisle vs. Grey*, and *Sweet vs. Herring*, the very same words are used, though no such effect was attempted to be ascribed to them. But if the word "son" was not in this devise, and in the place of it the word "issue" had in fact been used, it would have made no difference.

In *Backhouse vs. Wells*, 1 *Cases in Equity Abridged*, 184, pl. 27, the devise was to one for life, and after his decease to the issue male of his body, and to the heirs male of the bodies of such issue, and the first taker was held to have only an estate for life, the word "issue" not being *ex vi termini* a word of limitation, and the words of limitation grafted upon it, as in this case, showing that it was used as a word of purchase, and as descriptive of the person who was to take the estate tail. In the case of *Check vs. Day*, 2 *Roll. Ab.* 417, where the devise was to a woman for life, and after her death, to her heir, and the heirs of such heir, it was held that she took only an estate for life. And so in *Archer's* case, 1 *Coke*, 63, where the limitation was to one for life, and after his death to his next heir male, and the heirs male of the body of such next heir male. In both of those cases the word "heir" being used in the singular number, the superadded words of limitation restrained it to a word of purchase, which is stronger than the case of a limitation to one, and after his death to his "issue," and the heirs of such "issue." The case of *Legate vs. Sewell*, 1 *P. Wms.* 87, 1 *Cases in Equity Abridged*, 395, has been urged to show, that sons taking by seniority, and in succession, may still take as heirs; but that case will be found to have no bearing on this. There the devise was "to *William Legate* for life, and after his decease, to the heirs male of his body lawfully to be begotten, and the

heirs male of the body of every such heir male, severally and successively as they should be in priority of birth," &c. In that case the limitation was to the heirs male, &c. and though they were directed to take severally and successively, there was nothing explanatory of the words "heirs male of the body," and showing that the testator used them in any other than their technical sense; whereas in this case the limitation is to the first son, &c. and the word "heirs" never used. And in *Eisle vs. Grey, Lowe vs. Davies*, and *Sweet vs. Herring*, the sense in which the word "heirs" is used, is explained by the context, which shows the meaning annexed to it by the testator himself, and that he used it in the same sense as *first*, &c. sons. What has been said of the case of *Legate vs. Sewell*, may equally be said of *Jones vs. Morgan*, 1 *Brown's Chan. Rep.* 206, *Fearne*, 134, which was also relied on in argument. And the cases of *Langley vs. Baldwin*, 1 *Cases in Equity Abridged*, 185, and *The Attorney General vs. Sutton*, 1. *P. Wms.* 754, are not more applicable. In each of those cases, after a limitation to some only of the sons of the first taker successively in tail, there is a remainder over, on the death of the first taker without issue male of his body, which of itself was held to give him an estate tail. In *Robinson vs. Robinson*, 1 *Burr.* 38, and *Dodson vs. Grew*, 2 *Wils. Rep.* 324, it was held to be an estate tail in the first taker, in order to give effect to the manifest general and more weighty intention of the testator, which could not stand with the particular intention, and must have been sacrificed, if the minor particular intention had been gratified. And they were not decided on the ground that they were within the rule in *Shelley's* case, but on the *cy pres* doctrine, which has been carried quite far enough in another country. Here there is no general intention to be sacrificed at the shrine of a particular intent, and this case is clear of the principle governing that class of cases.

It was manifestly the intention of the testator to give to his grandson, *Charles Digges*, an estate for life, and no more. He begins with giving an estate for life to his son *William Digges*, the father of *Charles*; he next gives an estate for life to *Charles*, his grandson, and then goes on to limit an estate to the first, second, &c. and all and every other son of *Charles*, in succession, and the heirs of their bodies respectively. Now if it was not his intention that

the first and other sons of *Charles* should take the estate successively each in his own right, as the root of a new inheritance, and that *Charles* should take only an estate for life, why did he not follow the devise to *William Digges* for life, with a limitation to *Charles*, his son, in tail? This he has not done, and his avoiding to do it, clearly shows what his intention was. Besides, the limitation in tail general to the first and other sons in succession, of *Charles Digges*, is in exclusion of the daughters of *Charles;* whereas if he took an estate tail general, it might eventually go to his daughters, (if he had any,) as persons belonging to the class of described heirs, which was not the intention of the testator. He meant to give *Charles Digges* only an estate for life, otherwise, he would have grafted words of limitation on the devise to him, as he did immediately after on the limitation to his first son, &c. and that intention may be grafted without violating any positive rule of law.

That the words "to his issue in tail," in the devise to *Thomas Digges*, are controled by the next following words, "in such manner as I have limited the same to my grandson *Charles*, and his issue;" are explained to mean, to the first son, &c. of *Thomas;* as in the limitation to *Charles*, and his first and other sons, is a position fully sustained by the case of *Lisle vs. Grey*, where the words "and so severally and respectively to every the heirs male of the body of the said E," immediately after the limitations to the first, second, third, and fourth sons of the said E, and the heirs male of their bodies respectively, were held to be words of relation, and meant, in the same manner as the four first sons took, the words "and so" being the same as *eodem modo*. We are therefore of opinion, that *Thomas Digges* took only an estate for life in the premises devised to him. JUDGMENT AFFIRMED.